IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CIPLA LTD.,

                Plaintiff,

v.

SUNOVION PHARMACEUTICALS, INC.,

                Defendants.

No. 15-cv-00424 (LPS)

**DECLARATION OF PAUL BARTLETT, PHD. IN SUPPORT OF
SUNOVION'S OPENING CLAIM CONSTRUCTION BRIEF**

**I, Paul A. Bartlett, Ph.D., declare as follows:**

## I. INTRODUCTION

1.    I, Paul A. Bartlett, PhD., have been retained by counsel for Sunovion Pharmaceuticals, Inc. ("Sunovion"). All opinions and facts stated herein are true and correct to the best of my knowledge.

2.    I have been informed by Sunovion's counsel that the plaintiff Cipla Ltd. ("Cipla") has sued Sunovion for infringement of U.S. Reissue Patent No. RE 43,984 ("the '984 Reissue" or "Patent-in-suit").

3.    I submit this declaration in support of the Opening Claim Construction Brief submitted by Sunovion. In particular, I submit this declaration to provide relevant background regarding the technology at issue in the '984 Reissue and certain phrases therein, including phrases copied from Sunovion's U.S. Patent No. 6,995,310 ("Sunovion's Patent"), and to provide my opinions regarding the meaning of the disputed claim terms in the '984 Reissue (and where applicable, Sunovion's Patent) from a perspective of a person having ordinary skill in the pertinent art at the relevant time.

4.    The opinions expressed in this declaration are based on my education, knowledge, experience and my review of the materials cited or discussed in this report.

5.    If called as an expert witness for the Markman hearing in this matter, I anticipate that my testimony may concern the matters discussed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available, such as declarations or deposition testimony given by Cipla's expert. In connection with my testimony, I may present visual aids and demonstrative exhibits at the Markman hearing to support or explain my testimony.

6.     I expect to respond, as appropriate, to assertions made by any party or its experts in any declarations, depositions, Markman hearing, or otherwise.

7.     Below I summarize my background, qualifications and experience relevant to my opinions as expressed in this declaration.  Further details can be found in my curriculum vitae, attached hereto as Addendum A.

## II.     BACKGROUND AND QUALIFICATIONS

8.     I am currently a Professor of Chemistry, Emeritus, at the University of California, Berkeley.

### A.     Education

9.     I obtained my A.B. and A.M. in Chemistry from Harvard University in 1969 and my Ph.D. in Organic Chemistry from Stanford University in 1972.  From 1972 through 1973, I was a postdoctoral fellow at the University of California, San Diego.  My graduate and postdoctoral research was in the areas of synthetic and bioorganic chemistry.

### B.     Academic Experience

10.     I began teaching at Berkeley in 1973 and was Chair of the Department of Chemistry from 1996 to 2000.  I assumed Emeritus status in 2003.

11.     My teaching responsibilities have included courses in organic chemistry and medicinal chemistry, both at the undergraduate and graduate levels, including a course in which practicing industrial chemists lectured on various aspects of drug discovery.

12.     In addition to fulfilling my teaching duties as a Professor at Berkeley, I led a research group in the field of bioorganic chemistry and synthetic organic chemistry.  Under my direction, 63 students received their Ph.D. degrees, more than 75 postdoctoral fellows and visiting scientists carried out advanced research, and many undergraduate students had their first exposure to original research.  Some of my coworkers went into academia, while most have gone

on to successful industrial careers in research and development in the pharmaceutical, biotech, and agrochemical fields.

13.    From the start of my academic career in 1973, a primary focus of my research was the design, synthesis and evaluation of biologically active compounds.  One important area of my work involved the design of enzyme inhibitors through the preparation of novel compounds that mimicked an enzyme's natural substrate.  Through this work, I helped to advance both mechanism-based and structure-based strategies for the design of drug candidates.

14.    I have authored or co-authored more than 180 articles and abstracts on my research and interests in the fields of organic chemistry, bioorganic chemistry and drug design, and am named as an inventor on nine patents in these areas.  I have also served on the editorial advisory boards of several peer-reviewed technical journals, including the medicinal chemistry journal ChemMedChem, and I have chaired a number of technical conferences related to the field of drug discovery.

15.    I have also received several awards in my field.  Early in my career, I received the Stuart Pharmaceuticals Award, now known as the AstraZeneca Excellence in Chemistry Award, and an Eli Lilly Young Scientist Award, in recognition of my accomplishments in research and its relevance to the pharmaceutical industry.  I received the Cope Scholar Award from the American Chemical Society 1990 and was elected a Fellow in the American Academy of Arts and Sciences in 1994, of the American Association for the Advancement of Science in 1999, and of the Royal Society of Chemistry in 2009.

### C.    Industrial Experience

16.    My first exposure to industrial chemistry was at Sterling-Winthrop Research Institute in New York in 1971, where I was involved in synthesizing novel compounds

of possible therapeutic utility. Since then, I have had the opportunity to consult and lecture broadly with industry across many of my fields of interest.

17.     I first began working as a consultant in 1979, for the Bristol-Myers Company, consulting for both their research and development divisions. The former group was concerned with the discovery of new medicinal agents, and the latter was charged with finding efficient and workable methods for their manufacture. I had similar interactions with the corresponding divisions at Schering-Plough when I consulted for them from 1984-1996. During that period and since that time, I have consulted with or served on the scientific advisory boards of many companies engaged in medicinal chemistry, agrochemistry, biotechnology, and chemical software development, including:

- Bristol-Myers Company (1979-83);
- DuPont Central Research & Development (1980-87);
- Schering-Plough Corporation (1984-96);
- IGEN (Science Board, 1986-95);
- Celgene (Science Board, Member, 1987-91; Chair, 1991-96);
- Agouron Pharmaceuticals (1987-88, 1992-2004);
- Chiron Corporation (1988-93, 2004-05);
- SmithKline Beecham (Chemical Technologies Board, 1989-92);
- Sandoz Research Institute (Science Board, 1991-93, Chair, 1993);
- Molecular Simulations, Inc. (Science Board, 1991-1999);
- Tularik (acquired by Amgen, Science Board, 1992-2006);
- Bristol-Myers Squibb (1997-99);
- Rosetta Inpharmatics (Science Board, 1997-2001);
- Argonaut (Science Board, 2000-05);
- GlaxoSmithKline (2007);
- MannKind Corporation (Science Board, 2006-07);
- SGX Pharmaceuticals (Science Board, 2003-08);
- Sepracor, Inc. (2007-09); and
- Novartis (Science Board, 2000-11).

18.     I also co-founded a drug discovery company, Pharmacopoeia, in 1993.  In addition to my role as co-founder, I served as chair of the Scientific Advisory Board (from 1993-2008) and was a member of the Board of Directors (from 1998-2008).

19.     Through these engagements, I have had extensive involvement with all stages of drug discovery and development, from selection of therapeutic focus and biological target, to lead candidate identification, strategies for lead modification and advancement of improved compounds into pre-clinical and clinical testing.  I have worked directly with the medicinal chemists who were designing and developing the best way to manufacture novel compounds, and also with the various levels of management tasked with deciding which directions to take the research, and which projects and compounds to prioritize.

20.     My curriculum vitae includes a list of my publications.  On the basis of my education and the experience described above and in my curriculum vitae, I believe I am qualified to give the opinions set out herein.

## III.    MATERIALS RELIED UPON

21.     I have reviewed U.S. Patent Nos. 6,995,286; RE 43,844; RE 43,984; 7,256,310 and their prosecution histories and the Second Amended Joint Claim Construction Chart filed by the parties in this case.

## IV.    COMPENSATION

22.     I am being compensated $800 per hour for my work in connection with this case.

## V.    PRIOR EXPERT TESTIMONY

23.     The following is a summary of expert testimony during the past four years, opining on behalf of the underlined parties:

A. **By expert report, declaration, or affidavit:**

Nexium Antitrust Litigation (Massachusetts, 2013)
AbbVie v. Roxane (Ritonavir, S. Dist. Ohio, 2014)
Gilead & Emory v. Mylan (Truvada, N. Dist. West Virginia, 2015)
Novartis v. Par, Breckenridge & Roxane (Zortress & Afinitor, Delaware, 2015)
Gilead & Royalty Pharma Collection Trust v. Watson & Sigmapharm
(Ambrisentan, New Jersey, 2016)

B. **By deposition or cross examination (in addition to report or affidavit):**

Gilead v. Sigmapharm (Hepsera, New Jersey, 2011, 2013)
AstraZeneca v. Hanmi (Nexium, New Jersey, 2013)
Gilead & Emory v. Lupin (Truvada, S. Dist. NY, 2014)
Amgen-Canada v. Mylan (Sensipar, Canada, 2014)

C. **At trial or hearing (in addition to report, declaration, and/or deposition):**

Gilead & Emory v. Teva (Truvada, S. Dist. New York, 2013)
Vanda & Aventisub v. Roxane (Fanapt, Delaware, 2016)

## VI. APPLICABLE LEGAL PRINCIPLES

### A. Claim construction

24.     I am informed by counsel that consideration of the words in the patent, specification and prosecution history may be helpful in analyzing what the inventors understood the patent claim terms to mean, and in evaluating what the Patent Office understood the claim terms to mean.

25.     I am informed by counsel that the words of a claim are generally given their ordinary and customary meaning to one of skill in the art at the time of the invention, unless the patentee: (1) ascribed a different or special meaning to a claim term; or (2) disclaimed a specific interpretation of a claim term.

26.     I am informed by counsel that a patentee may limit claim scope by providing explicit definitions or express guidance on how claim terms ought to be construed. Such statements may have the effect of making claim scope narrower than it otherwise would be.

**B.    Prosecution Disclaimer**

27.    I am informed by counsel that a patentee may limit the meaning of a claim term by clearly characterizing the invention in a way to try to overcome rejections by the Patent Office based on prior art.  I am further informed that the policy underlying the doctrine of prosecution disclaimer is the protection of the public's right to rely on statements made by the patentee during prosecution.

28.    I am informed that when a patentee has disavowed or narrowed the scope of its patent claims, it cannot use the claim construction process to erase what it told the Patent Office in order to distinguish prior art or get back what it gave up in order to secure the patent. A patentee's statements to the Patent Office about the scope of its invention must be taken into account and inform the Court's construction of claim terms.

**C.    Copying of Claims To Provoke An Interference**

29.    I understand that two of the claims at issue in this case (9 and 10) were copied from Sunovion's U.S. Patent 7,256,310 ('310 patent).

30.    I am informed that when a party copies claims from another party's patent, that a court may examine how the term was defined in the host disclosure: i.e., the patent from which claims were copied.

31.    I am informed that on this basis, I may look to Sunovion's '310 Patent to decipher the meaning of levalbuterol L-tartrate in crystalline form, a claim copied by Cipla from Sunovion's '310 patent.

32.    I understand that Sunovion accorded a special meaning to this claim phrase in the '310 patent.

## VII.    LEVEL OF ORDINARY SKILL IN THE ART

33.    I am informed by counsel that terms in patent claims should be interpreted as they would have been understood by a person of ordinary skill in the art to which the invention related as of the time of the invention ("POSA").

34.    I have been asked by counsel to use 2001 as the relevant timeframe for the '984 Reissue and 2002 as the relevant timeframe for the '310 Patent.

35.    I understand that the person of ordinary skill in the art, as it pertains to the technology of the '984 Reissue, would have at least a Ph.D. in chemistry, organic chemistry or a related field or a Master's Degree in chemistry, organic chemistry or a related field with at least two to five years of experience in the pharmaceutical industry.

## VIII.   TECHNICAL BACKGROUND

### A.    Stereochemistry

36.    Although, on paper, chemical compounds can only be depicted in 2-dimensions, in reality they are 3-dimensional; hence simple 2-dimensional drawings may not convey all their structural complexities.  In particular, a carbon atom that is substituted with four different groups can exist in two different forms in three dimensions.  These forms differ in being mirror images of each other, much like our hands are mirror images of each other.  A molecule that can exist in these mirror image forms is *chiral* and is said to possess *chirality*.

37.    The two mirror image forms of a chiral molecule are called *enantiomers* of each other.  Enantiomers are isomers because they have the same molecular formula.  However, because the atoms are all connected in the same pattern, enantiomers are not structural isomers; instead they are called *stereoisomers* because they differ in the way the atoms are arranged in 3-dimensions.  The carbon atoms that are substituted with 4 different groups are variously called *stereocenters*, *chiral centers*, or *centers of asymmetry*.

-9-

38.    Salbutamol is one example of a chiral molecule for which there are two enantiomers, both of which are depicted below.   The central carbon atom is a stereocenter because it is substituted with a hydrogen (–H), a hydroxyl group (–OH), a substituted phenyl group, and a t-butylaminomethyl group (tBuNHCH$_2$–):



39.    As illustrated above, a general convention for showing specific 3-dimensional relationships in 2-dimensional drawings uses *bold and dashed* (or *wedged and hatched*) lines in place of straight lines between atoms.   A group connected by a bold (or wedged) bond comes off the surface of the paper toward the viewer, while one connected by a dashed (or hatched) bond goes off the paper away from the viewer; atoms connected by straight lines lie in the plane of the drawing.   Thus, in the above left depiction of salbutamol, the hydroxyl group (–OH) attached to the central carbon atom lies in front of the plane of the paper and the hydrogen atom lies behind it.   The substituted phenyl group and the t-butylaminomethyl group (tBuNHCH$_2$) are considered to be lying in the plane of the paper.

40.    The physical properties of enantiomers, such as solubility, melting point, density, etc., are identical, but enantiomers differ in the way they interact with polarized light (referred to as their *optical activity*), and they differ in the way they interact with other chiral species, such as biological drug targets and metabolic enzymes.

41.    The most commonly observed physical difference between enantiomers is the direction in which they rotate the plane of a beam of plane-polarized light passing through their solutions.  By convention, a compound that rotates plane-polarized light in the clockwise direction is said to be *dextrorotatory* (or "dextrorotary") and called the (+)-enantiomer.  Its enantiomer therefore rotates plane-polarized light in the counterclockwise direction and is said to be *levorotatory* (or "levorotary") and called the (−)-enantiomer.  The specific rotation of one enantiomer is equal in magnitude but opposite in sign to that of the other enantiomer.

42.    The term "enantiomer" applies to an individual, chiral molecule in describing its relationship to its mirror image stereoisomer.  A collection of chiral molecules, that is, a sample of the compound, may be comprised largely of one stereoisomer or it may consist of a mixture of the stereoisomers.  If the sample contains essentially equal amounts of both enantiomers, it is called the *racemate* or the *racemic form* of the compound or a *racemic mixture*. A commonly used analogy is to a collection of gloves: each individual glove is chiral, but since they are (almost invariably) sold in pairs, any typical collection of gloves will have equal amounts of left- handed and right-handed gloves and thus be "racemic."  Because a racemate consists of equal amounts of the dextrorotatory and levorotatory enantiomers, the effects of the individual molecules on polarized light cancel out; the racemic form is therefore optically *inactive*.

**Conveying Absolute Stereochemistry**

43.    The indication of a specific 3-dimensional structure of a chiral compound—its "absolute" configuration or stereochemistry—is also accomplished by accepted nomenclature conventions or contextual information.

-11-

44.    The *Cahn-Ingold-Prelog convention* assigns priority among the four groups attached to a stereocenter and then, depending on their absolute relationship in 3-dimensions, assigns either "*R*" or "*S*" as a *descriptor* to this stereocenter.  This 3-dimensional relationship is referred to as the *configuration* or *absolute configuration* of the stereocenter.  The assignment of the *R* or *S* configuration to a stereocenter in a particular enantiomeric form of a chiral molecule relies on an experimental determination.  Typical methods involve chemical or X-ray crystallographic correlations with other molecules of known absolute configuration.

45.    The *R* and *S* descriptors are determined by the absolute configuration at an individual stereocenter in the structure of a molecule; thus they are different from the physically observable dextro- or levorotatory property of an individual enantiomer.  There is, however, a correspondence between these designations for a particular molecule.  If an S-enantiomer is dextrorotatory or (+), the R-enantiomer will necessarily be levorotatory or (–).

46.    Once it has been determined which enantiomer of a chiral compound is dextrorotatory (or "(+)") (and thus which is levorotatory or "(–)"), the absolute configuration of an individual enantiomer can be determined simply from the direction that its solution rotates plane-polarized light.  The levorotatory enantiomer of salbutamol (see paragraph 38 above) has been found to have the R-configuration.  Thus, this particular enantiomer can be specified unambiguously by the designation (R)-salbutamol or by the designation (–)-salbutamol.  Either name distinguishes this enantiomer from (S)-salbutamol = (+)-salbutamol:

47.    Tartaric acid, with two stereocenters, also exists in two enantiomeric forms.  For this compound an alternative convention has also been used to specify the absolute configuration of the stereocenters, the so-called D/L nomenclature as opposed to the Cahn-Ingold-Prelog R/S nomenclature.  In the case of tartaric acid, the "L-enantiomer" has the R-configuration at both of the stereocenters, while the "D-enantiomer" has S-configured stereocenters.



**Conveying Enantiomeric Purity**

48.    Each of these conventions for specifying absolute stereochemistry: R/S, D/L combined with (+)/(−) (if the direction of rotation has been correlated with absolute stereochemistry) apply only to the molecular structure; they do not themselves specify the relative amounts of the two possible enantiomers in an actual sample of a compound, that is, the degree of *enantiomeric enrichment*.  Without more information, it may be unclear whether the

specified enantiomer predominates to only a slight extent or makes up the vast majority of the individual molecules present.

49.    The degree of enantiomeric enrichment is often expressed as the "optical purity" by reference to the magnitude of the observed rotation relative to a known sample of high enantiomeric purity.  It is also referred to as the "percent enantiomeric excess" or "% e.e.," which is determined by subtracting the proportion of the minor enantiomer from the proportion of the major enantiomer.  Thus for example, a 4:1 mixture of enantiomers, which would consist of 80% of one enantiomer and 20% of the other, has an enantiomeric excess of $80 - 20 = 60\%$ e.e.  Similarly, a 19:1 mixture, which would consist of 95% of one enantiomer and 5% of the other, has an enantiomeric excess of 90%.

50.    Compositions that consist essentially entirely of a single enantiomer are considered *optically pure* or *enantiopure*.

51.    The limiting case of 0% e.e.—that is, a mixture that contains essentially equal amounts of the two enantiomers—can be designated by the prefixes "(±)" or "rac" (abbreviation for *racemic*) before the name, or by simply calling the mixture "racemic."

52.    Finally, even in the smallest doses at which a drug is administered to patients, an incredibly large number of molecules of the active compound are present. Practically speaking, medicines that predominantly consist of a single stereoisomer are never perfectly 100% free, but rather, can only be substantially free of the other stereoisomer or enantiomer.

**Diastereomers**

53.    When a molecule contains more than one stereocenter, additional stereoisomeric relationships are possible.  Consider the simple molecule shown below, a four-

carbon chain substituted at the 2- and 3-positions with a hydroxyl (OH) group and an amino ($NH_2$) group; there are four possible stereoisomers for this structure:



54.     The left-to-right relationships at the top and bottom are enantiomeric because the structures are mirror images (S,S is the mirror image of R,R, and S,R is the mirror image of R,S). But the top-to-bottom relationships are not mirror images; the structures are said to be *diastereomeric*.

55.     The distinction between enantiomeric and diastereomeric relationships is significant because of the stereoisomers' physical properties. As noted in paragraph 40 above, enantiomers have identical physical properties (*e.g.*, solubility, melting point), unless they are interacting with a chiral environment such as a biological system. Because diastereomers are not mirror images, they usually do have different physical properties. The practical upshot of this difference is that diastereomeric compounds can be purified and separated from each other more easily than enantiomeric compounds, as discussed below.

### The *Resolution Process*: Separation of Enantiomers via Diastereomeric Intermediates

56.     The separation of a racemic mixture into the separated enantiomers is called *resolution*. However, because enantiomeric compounds have the same physical properties, conventional purification methods that rely on solubility, such as crystallization, are

ineffective at separating the racemic form (a 50/50 mixture of the two enantiomers) into the pure enantiomeric forms.  A common strategy for overcoming this challenge is to convert the enantiomers into diastereomers, which differ in their physical properties.  There are several ways that this strategy can be implemented, for example by forming a chemical bond between the racemate molecules and an enantiopure resolving agent or, for acidic or basic compounds, by forming diastereomeric addition salts with enantiopure bases or acids.

57.     In the case of salbutamol, addition of a solution of L-tartaric acid to a solution of salbutamol results in an acid-base reaction as a proton (hydrogen ion, $H^+$) is transferred from an acidic carboxyl group ($CO_2H$) of the tartaric acid to the basic amino group (–NH–) of salbutamol:



58.     When these salt components are in solution (the positively charged salbutamol *cation* and the negatively charged L-tartrate *anion*), the individual molecules are surrounded by solvent molecules and have little interaction with each other.  In contrast, in the solid or *crystalline form* of these salts, the cations and anions adopt a very ordered, three-dimensional arrangement in the *crystal lattice*.  The manner in which the individual molecules

interact with each other in the crystal lattice depends on their own 3-dimensional structure (*i.e.* their stereochemistry) and, in turn, determines the form and stability of the crystal lattice.

59.     Because the (*R*)-salbutamol L-tartrate addition salt is diastereomeric to the (*S*)-salbutamol L-tartrate addition salt, their crystalline forms are different and they have different physical properties, in particular different solubility properties.  Because the diastereomeric addition salts have different solubility properties, under appropriate conditions one of the salts crystallizes out of solution in preference to the other and it is possible to effect their separation.



(*R*)-Salbutamol L-bitartrate
(less soluble, crystallizes)

(*S*)-Salbutamol L-bitartrate
(more soluble, remains in solution)

isolation, purification

**Diastereomeric salts**

Resolution intermediate

60.     After separation of the R,L-salt from the S,L-salt, the resolution process is completed by treating the purified R,L-salt intermediate with base (*e.g.*, sodium methoxide) to convert the protonated (*R*)-salbutamol back to the neutral amine and allow it to be separated from the L-tartrate counterion.

Resolution intermediate

Sodium methoxide

Sodium L-tartrate

(*R*)-(−)-salbutamol

**Salt Nomenclature**

61.    Salts are comprised of positively charged *cations* and negatively charged *anions* in a ratio such that the combination is electrically neutral.  For instance, in the common salt sodium chloride, both the sodium cation, $Na^+$, and the chloride anion, $Cl^-$, are singly charged, hence there is one sodium ion for every chloride ion: NaCl.  The sodium cation and chloride anion are said to be *monoanions* because they carry a single positive or negative charge, respectively.

62.    Carbonic acid is a *divalent* acid.  It can react with one mole equivalent of base (*e.g.*, sodium hydroxide, NaOH) to give a salt, sodium bicarbonate ($NaHCO_3$), comprised of equal amounts of sodium cation, $Na^+$, and the bicarbonate monoanion, $HCO_3^-$.  Carbonic acid can also react with two mole equivalents of sodium hydroxide to give a salt, sodium carbonate ($Na_2CO_3$), comprised of sodium cations and carbonate *dianions* in a 2:1 ratio:

Sodium Bicarbonate
$NaHCO_3$



Sodium Carbonate
$Na_2CO_3$

63.    Sodium bicarbonate and sodium carbonate are different salts; they have different compositions and different physical and chemical properties.

64.    Tartaric acid is also a divalent acid and in a similar manner to carbonic acid can form salts as either a monoanion or dianion.  Potassium bitartrate (also known in cooking as "cream of tartar") is comprised of the potassium monocation, $K^+$, and the bitartrate monoanion:



Potassium bitartrate
$C_4H_5O_6K$



Potassium tartrate
$C_4H_4O_6K_2$

The dipotassium salt, potassium tartrate, is comprised of two potassium cations and one tartrate dianion.

65.    The common convention for naming such salts to distinguish the monovalent from the divalent forms is to append the prefix "bi-" to the name of the monovalent anion.  This convention is illustrated by the names "sodium bicarbonate" and "potassium bitartrate," shown above.  An example of a pharmaceutical that is provided in the form of a bitartrate salt is hydrocodone bitartrate, which is a component in the analgesic Vicodin:

Hydrocodone bitartrate

66.    In the absence the prefix "bi", it is understood that the anion is fully ionized; that is, the terms "carbonate," "sulfate," and "tartrate" refer to the doubly negatively charged dianions, distinct from "bicarbonate," "bisulfate," or "bitartrate" monoanions.

$CO_3^=$
carbonate

$HCO_3^-$
bicarbonate

$SO_4^=$
sulfate

$HSO_4^-$
bisulfate



tartrate



bitartrate

67.    For salts comprised of chemically complex components, a 2:1 ratio can also be specified by the prefix "hemi-" appended to the name of the anion, meaning that there is half a mole of dianion for each mole of the cation.  This practice is frequently used in defining pharmaceutical salts comprised of two molecules of the drug and a single molecule of the counterion, as illustrated below.

Zolpidem hemitartrate (Ambien)



Levalbuterol hemitartrate

68.    I note that this terminology is used explicitly in the '310 Patent:

Levalbuterol L-tartrate is a hemitartrate; that is to say it contains half a mole of L-tartaric acid per mole of levalbuterol.

['310 Patent, col. 1, ll. 65-67]

69.    Because the common recognition is that the ratio of cations and anions in a salt corresponds to the ratio of their complementary charges, even in the absence of the prefix "hemi-," it is understood that "sodium carbonate," "potassium sulfate," and "levalbuterol L-tartrate" each are comprised of two monocations (sodium, potassium, or levalbuterol cation) for each of the dianions (carbonate, sulfate, or L-tartrate).

## IX.    OPINIONS

### A.    The Tartrate Salt Disclosed In Example 9 of the '984 Reissue Is A 1:1 Ratio of (R)-Salbutamol Cation and L-Bitartrate Monoanion

70.    It is my opinion that the levalbuterol tartrate salt disclosed in the '984 Reissue is comprised of a 1:1 ratio of (R)-salbutamol cation and the L-bitartrate monoanion; that is, levalbuterol L-bitartrate or R (–) salbutamol L-bitartrate.  My opinion is based on the process described in Example 9 of the '984 Reissue, which discloses that the "R (–) salbutamol tartrate"

salt is prepared from a molar excess of L (+) tartaric acid over salbutamol (0.44 mole vs. 0.41 mole, respectively). In this proportion, the solution from which the tartrate salt crystallizes is comprised essentially exclusively of salbutamol cations (both (R)- and (S)-) and L-tartaric acid monoanions, plus the excess of L-tartaric acid, as shown below. ['984 Reissue, col. 7, ll. 25-39]



(R/S)-Salbutamol
0.41 mole

L-Tartaric acid
0.44 mole

(R/S)-Salbutamol cation
0.41 mole

L-Tartrate monoanion
0.41 mole

L-Tartaric acid
0.03 mole

71.    Because essentially no L-tartrate dianions are present under these conditions, the only (R)-salbutamol salt that can crystallize from this solution is the 1:1 salt with L-bitartrate monoanion.

72.    A further disclosure in the '984 Reissue is consistent with this understanding. Example 1 of the '984 Reissue describes a similar process for the resolution of racemic 4-benzyl albuterol (100 g., 0.30 mole) with L-tartaric acid (50 g., 0.33 mole), which is claimed to provide 65 g of (R)-4-benzyl albuterol-L-tartrate of 99% e.e. If this salt were comprised of a 2:1 ratio of (R)-4-benzyl-albuterol to L-tartrate, it would represent a 106% yield of the theoretical maximum, which is impossible. The product of Example 1 is clearly a salt comprised of a 1:1 ratio of (R)-4-benzyl-albuterol to *L-bitartrate*, representing an 89% yield of the theoretical maximum and consistent with the claimed yield of 45% based on racemic 4-benzyl albuterol. ['984 Reissue, col. 5, ll. 59-67]

-22-

73.     My opinion is reinforced by statements made by Cipla to the U.S. Patent Office in prosecuting the '984 Reissue, in which Cipla clearly distinguished its resolution process from that disclosed in the "Deng reference" cited by the Examiner. Cipla stated "In contrast [to Deng], the claimed tartrate salts of optically pure enantiomeric albuterol were prepared using a <u>molar excess of tartaric acid to salbutamol</u>." [A029, emphasis in original]  As made clear above, when L-tartaric acid is in molar excess to salbutamol, the only L-tartrate anion present in the mixture is the L-bitartrate monoanion and the only salt that is formed will consist of a 1:1 ratio of albuterol (salbutamol) to L-bitartrate.

74.     Cipla made the same argument in attempting to distinguish its process from "Gao et al.," a reference that was also cited by the Examiner. Cipla stated "Applicants have found, and have described in the present specification, that by using a molar excess, described with Examples of molar excess of (L) tartaric acid, much better results are obtained in terms of yield and purity that when a lower mole equivalent is used." [A139]

75.     Cipla further clarified the difference between the process of the '984 Reissue, which affords the 1:1 (R)-salbutamol L-bitartrate salt, and a process that would afford the 2:1 salt by using only half as much L-tartaric acid. Cipla stated "… Applicants have found that it is not actually possible to obtain proper resolution of a salbutamol precursor by using 0.5 mole equivalent of L tartaric acid. More than 1 mole equivalent of chiral tartaric acid is required in order to obtain the resolved salt in good yield and purity." [A139]

## B.     Disputed Claim Term: Pure and Isolated

76.     I am informed by counsel that statements made by Cipla to distinguish a prior art reference called Deng [A243-A279] during prosecution affected the scope of the claim term "pure and isolated" and that therefore, a court would not construe this term in accordance with its plain and ordinary meaning to a person of skill in the art at the time of the invention.

**Background**

77.    I have read Deng and understand it to disclose a resolution method whereby a combination of several enantiopure tartaric acid derivatives, including tartaric acid itself, is mixed with racemic salbutamol and leads to formation of a precipitate, characterized as an "inclusion complex."

78.    I understand that throughout prosecution of the '984 Reissue, Cipla tried to distinguish Deng on various grounds including that:

- "[i]n Deng, resolution of a racemate is carried out by a combinatorial approach using [] several resolving agents at a time" [A29];

- That Deng failed to provide any motivation to "use a molar excess of tartaric acid to salbutamol," [A029-30];

- That the Deng resolution methods could only be used to produce (R)-salbutamol-(D)-tartrate salt and (S)-salbutamol-(L)-tartrate salt [A045; A332];

- That Deng failed to teach the use of optically pure L-tartaric acid "to resolve racemic salbutamol (or any of its derivatives) through the isolation of an (R)-salbutamol-L-tartrate salt as an intermediate to making optically pure (R)-salbutamol . . . ." [A053]

79.    I understand however, that the Examiner continued to reject the claims until Cipla filed an amendment on June 21, 2012, again stating that "Deng fails to teach or suggest that optically pure L-tartaric acid can be used, alone [or] in combination, to resolve racemic salbutamol (or any of its derivatives) through the isolation of an (R)-salbutamol-L-tartrate salt as an intermediate to making optically pure (R)-salbutamol (i.e., (R)-albuterol, levalbuterol)" (A070) (emphasis in original), and that: "the teachings of Deng . . . in no way relate to the pending claims as a whole, which cover specific salt intermediates in pure and

-24-

isolated form that cannot be prepared from the Deng resolution process." [A072] (emphasis in original)

**Rao Declaration On Solubility**

80.    I understand that in this same amendment dated June 21, 2012, Dr. Dharmaraj Rao submitted a declaration in support of Cipla's '984 reissue application purporting to demonstrate the differences in solubility between (R)-salbutamol L-tartrate and (S)-salbutamol L-tartrate.  In this declaration, Dr. Rao describes clearly how he prepared each of these salts.

81.    To prepare the (R)-salbutamol L-tartrate salt, Dr. Rao obtained enantiomerically pure (R)-salbutamol prepared from (R)-benzyl salbutamol and then combined it with a *half-molar equivalent* of L-tartaric acid.  As discussed above, this combination is different from that described in Example 9 of the Cipla '984 Reissue patent and affords the 2:1 (R)-salbutamol L-tartrate salt, *not* the 1:1 L-bitartrate salt that is the resolution intermediate of Example 9.

82.    The (S)-salbutamol L-tartrate salt that Dr. Rao describes in his declaration is similarly prepared by combining the (S)-salbutamol enantiomer with a molar *deficiency*, not a molar excess of L-tartaric acid.  Thus, the material he isolates from this preparation is necessarily different from an (S)-salbutamol salt that could have been present in the process of Example 9.

83.    Because the materials whose solubilities Dr. Rao compared in his declaration are different chemical compositions from the salbutamol L-bitartrate salts disclosed in the Cipla '984 Reissue patent, the results he obtained have no bearing on the patentability of the claimed invention.

84.    Notwithstanding, I understand that the Examiner nevertheless withdrew his previous rejections based on Deng based on Cipla's June 21, 2012 amendment.

### C.    Disputed Claim Term: In Crystalline Form

85.    It is my opinion that the ordinary meaning of the term "in crystalline form" is that the component molecules of a material are oriented in a regular, three-dimensional arrangement relative to each other in the solid state.  This regular orientation of the molecules is repeated and extends in all three dimensions in a way that is characterized as the "crystal lattice."  However, I am informed that when it comes to interpreting "levalbuterol L-tartrate in crystalline form" in the '310 patent, from which Cipla copied this claim phrase, that the '310 patent ascribed a special definition to the phrase "levalbuterol L-tartrate in crystalline form."

86.    The crystalline form of the levalbuterol L-tartrate in Sunovion's '310 patent is necessarily a crystalline form different from that of the material disclosed in the Cipla '984 Reissue because the material Cipla described is the *bitartrate* salt, not the *hemitartrate* salt of Sunovion's '310 patent.

87.    It is my opinion that one skilled in the art would understand the "crystalline form" disclosed in the '310 patent as having the structure as specified therein, which was found by the '310 inventors to be suitable for use in a metered dose inhaler.

88.    This construction is supported by multiple statements in the '310 patent, including the statement that "A novel salt of levalbuterol has now been found that can be obtained in a crystalline form possessing properties particularly desirable in a particulate product to be formulated for administration by inhalation" ['310 patent, col. 1 lns. 59-62]; that Sunovion's "invention provides a salt of levalbuterol that affords crystals capable of delivering levalbuterol into the lungs of a patient using a metered dose inhaler" [A194]; and that "[t]he compound needs to be in crystalline form in order to be used in an aerosol formulation adapted for administration using a metered dose inhaler .. . . The specification teaches how to make levalbuterol L-tartrate in crystalline form and how to use it in a metered dose inhaler."  [A229]

89.     I understand that the Examiner relied on these statements during prosecution of Sunovion's patent. [A223]

90.     None of the intrinsic evidence cited by Cipla describes any structure of the crystalline materials claimed, nor does it describe any form of levalbuterol L-tartrate.  It is my opinion that the intrinsic evidence cited by Cipla does not have any relevance to the definition of a levalbuterol L-tartrate salt or (R)-salbutamol (L) tartrate salt "in crystalline form."

91.     Col. 4, ll. 13-21 of the '984 Reissue discloses a process that purportedly provides "crystals of the (L) or (D) tartrate salt of 4-benzylalbuterol."  This material is not levalbuterol L-tartrate.  This process is detailed in Example 1 (Col. 5, ll. 56-67), which, as explained above in paragraph A.72, does not even provide the L-tartrate salt claimed (the product of Example 1 is the L-bitartrate salt).

92.     Col. 6, ll. 27-44 (Example 4), describes a process that purports to provide crystals of R(-) methyl-5-[2-[(1,1-dimethylethyl)amino]-1-hydroxyethyl]-2-(phenylmethoxy)-benzoate L-tartrate ("R(–) ester-L-tartrate").  However, this material is not levalbuterol L-tartrate, nor, based on the process described, does it appear even to be an L-tartrate salt.

93.     Col. 6, l. 59 – Col. 7, ln. 2 (Example 6) describes a process that purports to give crystals of the D-tartrate salt of S-4-benzyl albuterol.  Again, this material is not levalbuterol L-tartrate, nor, based on the process described, does it appear even to be an L-tartrate salt.

94.     Col. 7, ll. 25-39 (Example 9) describes a process that purports to give crystals of (R)-salbutamol L-tartrate.  However, as discussed above in paragraphs A.70-A.75, this material is clearly the *L-bitartrate* salt, not the claimed L-tartrate resolution intermediate.

95.     It is my opinion that none of the five citations offered by Cipla as intrinsic evidence show levalbuterol L-tartrate or (R)-salbutamol (L) tartrate salt in any form whatsoever, let alone in crystalline form.

**D.     Disputed Claim Term: Pharmaceutically Acceptable salt**

96.     While tartrate salts are generally understood to be pharmaceutically acceptable salts, I am informed that Cipla used the term in a specific way in the '984 Reissue and its related '286 and '844 patents.

97.     I understand that Sunovion construes the phrase "pharmaceutically acceptable salt" in the context of the '984 Reissue to mean: "A final product of the originally claimed processes, excluding an intermediate of a levalbuterol salt, that is formed after a conversion step."

98.     The Cipla '984 Reissue is concerned with a process which provides "[o]ptically pure (R) or (S) salbutamol by resolving a racemic or optically impure mixture of enantiomers of salbutamol or a salbutamol precursor with either (L) or (D) tartaric acid, and where necessary converting said precursor into either (R) or (S) salbutamol respectively; then optionally converting said optically pure (R) and/or (S) salbutamol into a pharmaceutically acceptable salt."  [CIPLA_LEVT_00000001]

99.     The clear indication from this description is that the "pharmaceutically acceptable salts" envisaged in the '984 Reissue are salts that are prepared *from* enantiomerically pure (R) or (S) salbutamol, not salt intermediates that are converted *into* (R) or (S) salbutamol or salbutamol precursors.

100.     This interpretation is reinforced by the specification of the '984 Reissue, which states "If desired, a pharmaceutically acceptable salt of the free base can be obtained by the addition of an acid (for example, dilute sulphuric acid or hydrochloric acid) in the usual

way." [CIPLA_LEVT_00000003 at col. 4 lns. 42-46]  The term "free base" refers to the neutral (R) or (S) salbutamol after it has been liberated from the resolution intermediate salt or been formed from conversion of the resolved precursor.

101.    Repeated throughout the '984 Reissue is the concept that conversion of optically pure (R) salbutamol into "a pharmaceutically acceptable salt" is optional. [E.g., CIPLA_LEVT_00000002 at col. 2 lns. 10-12, col. 2 lns. 58-60]  Formation of the tartrate salts that are intermediates in the resolution processes of the '984 Reissue and its related '286 and '844 patents is not "optional."   In contrast, formation of these salts and their subsequent decomposition are integral and necessary steps in the processes described in these patents.   The invention of the '286 patent cannot be practiced and the enantiomerically pure (R) and (S) salbutamol free bases cannot be obtained without formation and subsequent decomposition of the tartrate salts.   These salts are thus clearly distinct from the "pharmaceutically acceptable salts" that the '984 Reissue teaches can be "optionally" prepared.

102.    The examples provided in the '984 Reissue patent further support this interpretation.  Examples 1, 2 and 3 describe a sequence of steps in which 4-benzyl albuterol is resolved via the L-bitartrate salt (Ex. 1), the R(–)-4-benzyl albuterol resolution intermediate is converted to the free base form by removal of the tartrate component (Ex. 2), and this precursor is converted to R(–) salbutamol by hydrogenation and then directly to the sulfate as the pharmaceutically acceptable salt product.

103.    Examples 4 and 5 also describe a sequence of reactions in which L-tartaric acid is used only for a resolution step, with the tartrate component immediately removed from the resolution intermediate before it is carried on in subsequent reactions.

104.    Examples 6, 7, and 8 are directly analogous to Examples 1, 2 and 3; indeed, the procedures are identical, even in terms of quantities used and results obtained, except for the use of D-tartaric acid as the resolving agent and formation of (S)-salbutamol sulfate as the final product.

105.    Finally, in Example 9, racemic salbutamol is resolved with L-tartaric acid, the tartrate component is removed from the resolution intermediate, and the (R)-salbutamol free base is converted to the sulfate as the pharmaceutically acceptable salt product.

106.    In light of the fact that "pharmaceutically acceptable salts" are only described for the final products of the processes of the '984 Reissue and that their formation is clearly "optional," in my opinion one skilled in the art would not understand this term to encompass the resolution intermediate salts that are disclosed and required in this patent.

107.    Specifically, the skilled person would not consider the (R) salbutamol L-bitartrate intermediate disclosed in Example 9 to be a pharmaceutically acceptable salt as Cipla employs this term in the '984 Reissue .

108.    In conclusion, it is my opinion that levalbuterol L-tartrate, crystalline or otherwise, is not disclosed in the '984 Reissue.

109.    I  reserve the right to supplement and/or amend my declaration as appropriate.

I declare under penalty of perjury that the foregoing and the contents and opinions expressed in my written declaration, to the best of my knowledge, are true and correct.

Dated:    June 24, 2016                                     _____
                                                                              Paul A. Bartlett, PhD

-30-